# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

Information associated with **(414) 308-6109, more fully described in Attachment A.**

Case No. 16-962M (NJ)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Information associated with **(414) 308-6109, more fully described in Attachment A.**

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:
21 USC § § 841(a)(1) and 846, and 21 USC § § 1956 and 1957

The application is based on these facts: See attached affidavit.

☒ Delayed notice of _180_ days (give exact ending date if more than 30 days: _May 22, 2017_ requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Matthew Cooper, DEA Special Agent
*Printed Name and Title*

Sworn to before me and signed in my presence:
Date: _November 23, 2016_

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin
Nancy Joseph, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Matthew Cooper, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Verizon Wireless, a wireless provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey, 07921. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Verizon Wireless to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2. I am employed as a Detective with the Milwaukee Police Department and have been a law enforcement officer for over 19 years. I have been a Detective for over 13 years and have been assigned to the Narcotics Division for over 12 years. I was previously assigned to the Vice Control Division (Narcotics) as a Police Officer for over 2 years. I have been assigned to the High Intensity Drug Trafficking Area (HIDTA) for over 8 years. I am also a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA), and have been since October, 2008. As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

3. During my career in law enforcement, I have investigated violations of federal narcotics laws and related violations, including federal firearms and money laundering offenses. I have had formal training and have participated in numerous complex narcotics trafficking investigations, including complex conspiracies and investigations involving Federal wiretaps.

Based on my training, experience, and participation in drug trafficking investigations and associated financial investigations involving large amounts of heroin, cocaine, crack cocaine, methamphetamine, marijuana, and/or other controlled substances, I know and have observed the following:

    a. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

    b. I have also relied upon informants to obtain controlled substances from dealers by making controlled purchases of controlled substances from dealers. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

    c. I am familiar with the appearance and street names of various drugs, including marijuana, methamphetamine, heroin, cocaine, cocaine base (crack cocaine), and ecstasy. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

    d. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

    e. I know that drug traffickers often use various communication devices to conduct drug trafficking operations, and that drug traffickers often communicate on cell phones using text messages and direct connect cell phone capabilities;

    f. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

    g. I have been assigned to court authorized wiretaps and have been trained to operate the equipment utilized to conduct such operations. Furthermore, I have listened to hundreds of coded drug-related phone calls between drug suppliers and customers and have later interviewed numerous drug dealers whose conversations had been intercepted regarding these coded conversations;

    h. I know that drug traffickers often list their telephones in nominee names in order to distance themselves from telephones that are used to facilitate drug trafficking; and that drug traffickers frequently change phone numbers in an effort to thwart law enforcement; and

i. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials.

4. I am currently participating in an investigation of two heroin, cocaine, methamphetamine, and marijuana trafficking organizations led by Pablo HIDALGO-SANCHEZ and Luis GOMEZ hereinafter referred to as the HIDALGO-SANCHEZ DTO and the GOMEZ DTO. Juan AVINA has been identified as a high-ranking member of the HIDALGO-SANCHEZ DTO. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; and (c) information obtained from cooperating citizen witnesses, confidential sources, and defendants, whose reliability is established herein.[1] This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 1956 and 1957, have been committed by Juan AVINA and others. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

---

[1] Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

3

## PROBABLE CAUSE

6. Since 2012, case agents have been receiving information regarding the drug trafficking activities of Pablo HIDALGO-SANCHEZ aka "Peewee," Luis F.GOMEZ aka "Paco," and others. The investigation to date has identified two distinct drug trafficking organizations. One organization is led by HIDALGO-SANCHEZ and the other organization is led by GOMEZ. While these organizations operate independently, they share common sources of supply and will supply each other with narcotics when they are not available from other sources. Both organizations distribute heroin, cocaine, methamphetamine, and marijuana in the Milwaukee, Wisconsin area. The HIDALGO-SANCHEZ and GOMEZ DTOs are also involved in human trafficking, fraudulent documents, money laundering, and illegal gambling on horse racing and cock fighting. Pablo HIDAGO-SANCHEZ and Luis GOMEZ have been large scale drug traffickers in the Milwaukee area since about 2006. The HIDALGO-SANCHEZ and GOMEZ DTOs supply narcotics to several different criminal organizations in Milwaukee and the surrounding areas. Multiple confidential sources have told case agents that the HIDALGO-SANCHEZ and GOMEZ DTOs obtain heroin, cocaine, methamphetamine, and marijuana from multiple sources of supply in Mexico; San Antonio, TX; Stockton, California; and Chicago, Illinois. Based upon confidential source information, phone records, surveillance, controlled drug purchases, and Milwaukee Police Department police reports Pablo HIDALGO-SANCHEZ and Luis GOMEZ are believed to be in command of the DTOs. The DTOs are believed to earn approximately $150,000 - $180,000 weekly from illegal activities.

7. On August 31, 2016, case agents interviewed a confidential source, hereinafter referred to as CS-1[2], regarding drug trafficking activities in the Milwaukee area. CS-1 identified Juan Antonio AVINA as a member of a DTO operating in the Milwaukee area and identified a photo of AVINA. CS-1 stated AVINA travels to Stockton, California and brings back multiple kilograms of heroin, methamphetamine, cocaine, and marijuana under the direction of DTO leaders. CS-1 stated that in mid-August 2016, DTO leaders had a trailer with 500 pounds of marijuana delivered from California to a truck stop in Chicago. CS-1 stated AVINA drove to the truck stop and picked up the trailer. AVINA was then instructed to deliver the marijuana to 1227 S. 33rd Street, Milwaukee, Wisconsin.

8. CS-1 identified AVINA's phone number at the time as (414) 629-2083. On or about September 25, 2016, CS-1 informed case agents that DTO leaders were currently in the Stockton, California area arranging for a quantity of methamphetamine to be delivered to Milwaukee. Telephone records for (414) 629-2083 revealed that cell phone was in frequent contact with numerous cellular telephone numbers assigned area code 209. Case agents are aware that 209 is the area code for Stockton, California. Telephone records also revealed that (414) 629-2083 was in frequent contact with (857) 880-0758. Multiple DEA investigations have revealed that (857) 880-0758 is being used by a subject involved in money laundering throughout the United States. Court-

---

[2] Case agents believe CS-1 is a credible and reliable person. CS-1 has been providing reliable information to law enforcement since 2012. CS-1 has conducted multiple controlled purchases of narcotics from individuals. CS-1 has conducted consensually-recorded conversations with drug dealers, both in person and on the telephone. CS-1's information has never been found to be false or misleading. CS-1 has made statements to case agents that are against his/her penal interests, in that CS-1 has admitted his/her involvement in the DTO's activities in the past. The information provided by CS-1 is consistent with evidence obtained elsewhere in this investigation and/or substantial portions of CS-1's information has been corroborated through independent investigation, including surveillance, information from other confidential sources, controlled buys, and consensually-recorded conversations and phone calls. CS-1 is cooperating with case agents for consideration in a pending immigration matter.

5

authorized positional information for (857) 880-0758 revealed the phone was in Stockton, California at the time the phone was in contact with (414) 629-2083.

9. On October 18, 2016, at about 2:00 p.m., court-authorized positional information for (414) 629-2083 showed that AVINA entered Interstate 94 east in the Milwaukee area and drove four hours to Michigan. Less than two hours later, AVINA and the phone travelled four hours back to Milwaukee and went to the residence of AVINA. Case agents later learned from CS-1 that AVINA had travelled to Michigan to deliver about 9 ½ pounds of methamphetamine to a distributor at that location. Telephone records revealed that during that trip to Michigan, AVINA was in frequent contact with Pablo HIDALGO-SANCHEZ using both voice calls and text messages.

10. According to CS-1, on October 21, 2016, AVINA travelled to Stockton, California to facilitate the purchase and transportation of additional quantities of methamphetamine and other drugs. On October 21, 2016, at approximately 2:22 a.m., AVINA stopped using (414) 629-2083. CS-1 identified **(414) 308-6109 (Target Cell Phone C)** as another phone being used by AVINA to conduct drug trafficking activities. Telephone records for **(414) 308-6109 (Target Cell Phone C)** reveal that this number is in frequent contact with members of the HIDALGO-SANCHEZ DTO.

11. Case agents believe AVINA utilizes **(414) 308-6109 (Target Cell Phone C)** to conduct drug-related conversations with members of the HIDALGO-SANCHEZ DTO as well as other drug traffickers in furtherance of the DTOs activities. For example, telephone records reveal that from November 15, 2016 thru November 21, 2016, **(414) 308-6109 (Target Cell Phone C)** had approximately 122 contacts with (414) 346-3867, the phone used by Pablo HIDALGO-SANCHEZ. 60 of those contacts were voice calls and 62 were text messages. Similarly, from August 4, 2016 thru November 16, 2016, **(414) 308-6109 (Target Cell Phone C)** was in contact with (414) 292-5312 a total of 93 times. This phone is known to be used by Efrain SANCHEZ, the uncle of Pablo

6

HIDALGO-SANCHEZ. CS-1 identified SANCHEZ as a drug and money courier for the HIDALGO-SANCHEZ DTO who also stores narcotics for the DTO. Of those 93 contacts, 63 were voice calls and 30 were text messages. Additionally, from August 4, 2016 thru November 14, 2016, **(414) 308-6109 (Target Cell Phone C)** was in contact with (209) 688-4235 a total of 533 times. This phone is used by Armando ESQUIVEL, a cousin of Pablo HIDALGO-SANCHEZ who is also involved in drug trafficking with members of the DTO. Of those 533 contacts, 498 were voice calls and 35 were text messages. Case agents are also aware that **(414) 308-6109 (Target Cell Phone C)** is capable of receiving and retrieving voicemail messages.

12. On November 14, 2016, the Honorable Nancy Joseph, United States Magistrate Judge in the Eastern District of Wisconsin, signed a Search and Seizure Warrant authorizing the search of Verizon Wireless records for information related to **(414) 308-6109 (Target Cell Phone C)**, including the content of stored text message communications to and from **(414) 308-6109 (Target Cell Phone C)**. On November 17, 2016, case agents received a response from Verizon Wireless that included the requested text message content from November 3, 2016 thru November 10, 2016. A review of those text messages revealed that Juan AVINA used **(414) 308-6109 (Target Cell Phone C)** to conduct drug-related conversations via text message. For example, on November 3, 2016, at 7:40 p.m., AVINA, using **(414) 308-6109 (Target Cell Phone C)**, sent a text message to (414) 335-5996 that read, "Could you pass by the house for that? My brother has it?"[3] At 7:41 p.m., a text message was sent from (414) 335-5996 to **(414) 308-6109 (Target Cell Phone C)** that read, "The full ones or." At 7:56 p.m., a second text message was sent from (414) 335-5996 to **(414) 308-6109 (Target Cell Phone C)** that read, "Are you going to borrow me half." At 7:51

---

[3] The listed test messages were sent in Spanish and were subsequently translated by Spanish-speaking case agents.

p.m., AVINA, using **(414) 308-6109 (Target Cell Phone C)**, sent a text message to (414) 335-5996 that read, "(414) 501-6567. It's my brother's." Case agents believe AVINA asked if the unidentified user of (414) 335-5996 could go to AVINA's residence to pick up an undetermined amount and type of narcotics and stated he brother had the narcotics. The user of (414) 335-5996 asked if the narcotics were full kilograms and then asked if AVINA was going to provide a half kilogram of narcotics on consignment. AVINA provided the user of (414) 335-5996 with a phone number of his brother, Jose AVINA-CASTRO so that they could discuss the transaction in person.

13. Additionally, on November 3, 2016, at 9:56 p.m., a text message was sent from (262) 997-7259, to **(414) 308-6109 (Target Cell Phone C)** that read, "2467 s 9th st." A follow-up text message was sent from this number to **(414) 308-6109 (Target Cell Phone C)** at 10:56 p.m. that read, Milwaukee wi 53215." The user of (262) 997-7259 has been identified as Gregory BLAKE. On November 4, 2016, a text message was sent from **(414) 308-6109 (Target Cell Phone C)** to (414) 501-6567. This phone is known to be used by AVINA's brother, Jose AVINA-CASTRO. The text message read, "2467 s 9th st." At 2:12 p.m., another text message was sent to AVINA-CASTRO which read, "(262) 997-7259 this is his number. When he calls you let him know that you're my brother." At 4:33 p.m., another text message was sent to (414) 501-6567 that read, "34.500 for the piece + 1800 owed." On November 4, 2017, at 5:17 p.m., AVINA sent a text message to AVINA-CASTRO that read, "Are you going over there?" At 5:17 p.m., AVINA-CASTRO replied, "Yes." At 5:20 p.m., AVINA-CASTRO sent a text message to AVINA that read, "Then send me what you said about the black guy." At 5:32 p.m., AVINA-CASTRO sent a text message to **(414) 308-6109 (Target Cell Phone C)** that read, "Are you working or what? The black guy said he gets out at 5:30." At 5:35 p.m., AVINA sent a text message to AVINA-CASTRO that read, "Yeah. He answered me. He's on his way." At 5:36 p.m., AVINA-CASTRO sent a text

8

message to AVINA that read, "The black guy." AVINA immediately replied, "Both of them." AVINA then sent another text message to AVINA-CASTRO at 5:36 p.m., which read, "Be on point and count the money right." At 5:42 p.m., AVINA-CASTRO sent a text message to **(414) 308-6109 (Target Cell Phone C)** that read, "I forgot. Tell me what I'm going to get." At 6:48 p.m., AVINA sent a text message to AVINA-CASTRO that read, "Are you doing that?" At 6:49 p.m., AVINA-CASTRO replied, "Yes." At 6:50 p.m., AVINA sent two text messages to AVINA-CASTRO that read, "For what" and "34.500 + 1800. Show it to the black guy." Case agents believe Gregory BLAKE sent a text message to AVINA containing an address of where he would be located. AVINA then sent a series of text messages to AVINA-CASTRO that contained BLAKE's address as well as an amount of money. Case agents are aware that $34,500 would be consistent with the price of a kilogram of cocaine. Case agents believe AVINA told AVINA-CASTRO how much to charge BLAKE for the kilogram of cocaine and indicated that BLAKE still owed $1,800 for a prior drug delivery. AVINA and AVINA-CASTRO continued to discuss when AVINA-CASTRO would meet with BLAKE. Case agents believe AVINA-CASTRO then met with BLAKE and delivered a kilogram of cocaine to him.

14. On November 17, 2016, a preservation letter was sent to the custodian of records of Verizon Wireless to retain all stored electronic communications and other files associated with the Verizon Wireless target telephone number **(414) 308-6109 (Target Cell Phone C)**, the telephone number of Juan AVINA, including all content of opened and unopened voicemail and text messages. Case agents received an acknowledgment from Verizon Wireless indicating that the requested information from November 8, 2016 thru November 17, 2016 had been preserved. The information from November 8, 2016 thru November 10, 2016 has already been received pursuant to the previous warrant described above and is not being sought by this application.

9

15. This application for a search and seizure warrant is for the records referenced above in Paragraph 14 for the target telephone number of Juan AVINA, **(414) 308-6109** (**Target Cell Phone C**), only for the dates of November 11, 2016 thru November 17, 2016.

16. In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and un-retrieved voicemail, text, and multimedia messages for Verizon Wireless subscribers may be located on the computers of Verizon Wireless. Further, I am aware that computers located at Verizon Wireless contain information and other stored electronic communications belonging to unrelated third parties.

17. Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail. If the subscriber does not delete the message, the message may remain in the system of Verizon Wireless for weeks or months.

18. Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging" or "wireless messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Verizon Wireless for short periods incident to and following their transmission. In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

19. Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

20. Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

21. Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to

the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

22. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

23. In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

24. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Verizon Wireless to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.

12

Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

25. Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

26. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 180 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **(414) 308-6109 (Target Cell Phone C)** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrants, the proposed search warrants do not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrants authorize the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

13

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with **(414) 308-6109 (Target Cell Phone C)** that is stored at premises owned, maintained, controlled, or operated by Verizon Wireless, a wireless provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey, 07921.

## ATTACHMENT B

### Particular Things to be Seized

### I. Information to be disclosed by Verizon Wireless

To the extent that the information described in Attachment A is within the possession, custody, or control of Verizon Wireless, including any messages, records, files, logs, or information that have been deleted but are still available to Verizon Wireless or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Verizon Wireless is required to disclose the following information to the government for each account or identifier listed in Attachment A: All voice mail, text, and multimedia messages stored and presently contained in, or on behalf of the account or identifier from November 11, 2016 thru November 17, 2016;

a. All existing printouts from original storage of all of the text messages described above;

b. All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from November 11, 2016 thru November 17, 2016;

c. All text messaging logs, including date and time of messages, and identification of numbers associated with the handsets sending and receiving the message;

d. All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers'

full names, addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

e. Detailed billing records, showing all billable calls including outgoing digits, from November 11, 2016 thru November 17, 2016;

f. Incoming and outgoing telephone numbers, from November 11, 2016 thru November 17, 2016;

g. All records indicating the services available to subscribers of individual accounts and/or identifiers described above;

h. All records pertaining to communications between Verizon Wireless and any person regarding the account or identifier, including contacts with support services and records of actions taken.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. § 841(a)(1) and 846, possession with intent to distribute, distribution of heroin and conspiracy to violate those statutes, involving Juan AVINA since November 11, 2016, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a. The transportation, concealment, and distribution of illegal drugs and related proceeds.

2

b.  Records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts.

3